People v Hernandez (2018 NY Slip Op 07196)





People v Hernandez


2018 NY Slip Op 07196


Decided on October 25, 2018


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: October 25, 2018

107152

[*1]THE PEOPLE OF THE STATE OF NEW YORK, Respondent,
v
NORBERTO HERNANDEZ, Appellant.

Calendar Date: September 11, 2018

Before: Garry, P.J., Clark, Mulvey, Rumsey and Pritzker, JJ.


Amanda FiggsGanter, Albany, for appellant.
P. David Soares, District Attorney, Albany (Noel Mendez of counsel), for respondent.



MEMORANDUM AND ORDER
Garry, P.J.
Appeal from a judgment of the County Court of Albany County (Herrick, J.), rendered May 20, 2012, convicting defendant following a nonjury trial of the crimes of assault in the first degree and criminal possession of a weapon in the fourth degree.
After a December 2010 altercation in which the victim was stabbed, defendant was charged with assault in the first degree and criminal possession of a weapon in the fourth degree. As pertinent here, defendant asserted the defense of justification. Following a nonjury trial, he was convicted as charged and sentenced to a prison term of 7½ years, to be followed by three years of postrelease supervision. Defendant appeals.
Defendant asserts that his convictions are not supported by legally sufficient evidence and are against the weight of the evidence on several grounds, including a claim that the People failed to disprove his justification defense beyond a reasonable doubt. As a preliminary matter, defendant's legal sufficiency challenge is unpreserved, as his general motion for a trial order of dismissal was not specifically directed at any of the alleged errors (see People v Gray, 86 NY2d 10, 19 [1995]; People v Perillo, 144 AD3d 1399, 1400 [2016], lvs denied 29 NY3d 948, 951 [2017]). Nevertheless, as part of this Court's weight of the evidence review, "we necessarily determine whether the elements of the crime[s] were proven beyond a reasonable doubt and whether the justification defense was disproven" (People v Vanderhorst, 117 AD3d 1197, 1198 [2014], lv denied 24 NY3d 1089 [2014]; see generally People v Danielson, 9 NY3d 342, 349 [2007]). "[T]he appropriate standard for evaluating a weight of the evidence argument on appeal is the same regardless of whether the finder of fact was a judge or a jury" (People v Race, 78 AD3d 1217, 1219-1220 [2010] [internal quotation marks and citation omitted], lv denied 16 NY3d 835 [2011]; accord People v Crosby, 151 AD3d 1184, 1185 [2017]).
The trial evidence established that defendant and his estranged wife had separated a few months before the incident and that the victim and the wife were in a romantic relationship that had begun before the separation. These three individuals, who were the only witnesses to the [*2]altercation, gave sharply conflicting accounts of the event. The victim testified that he had never previously met defendant and had seen him only once before the incident. On Christmas Eve, he drove a car that he had borrowed from a mutual friend to the mall, where he met the wife to do some last minute holiday shopping. They visited several stores, where the wife shopped for a gift for her daughter. After she purchased the gift, the victim transported her to a restaurant where she was scheduled to work an evening shift. At the wife's workplace, the victim saw a parked red car. When he opened the door to help the wife with her purchases, the red car moved and blocked his car. The driver, who proved to be defendant, emerged and told the victim that he wanted to see him. The victim responded that he had nothing to talk with defendant about. He testified that he was helping the wife unload shopping bags from the vehicle when defendant "jumped on top of [him]," started hitting him and threw him to the ground, where the two men wrestled with each other. While they struggled, the victim was "hit" with "something," causing him to grab the area of his left upper chest, where he felt a laceration. Defendant "went on top of [the victim] again" and they continued to fight. The victim asserted that he heard defendant say that he wanted to "take [his] eye out" and that he was going to kill the victim. As they struggled, defendant inflicted wounds on the victim's face, hand and head. The victim said that defendant then went to his car and left while the victim remained lying on the pavement, and that, at some point, defendant returned briefly, apparently to get something, and then left again. The victim said that the object that cut him was a "thing with a blade" about four inches long. Photographs of his injuries, including a wound to the left chest and multiple lacerations on the face, head and hand, were admitted into evidence along with the victim's medical records. The victim displayed scars on his face, head and chest during the trial, and defendant and the People stipulated that he had suffered serious physical injury within the meaning of the Penal Law.
The wife, who was no longer romantically involved with the victim by the time of trial, testified for the People, but gave a significantly different account of events from that offered by the victim. She testified that she and defendant retained a friendly relationship after their separation because they had a young daughter. On Christmas Eve, she and defendant planned to meet at the mall to buy a dress for the daughter. However, defendant did not receive an expected lunch break from his work as a chef at a nearby restaurant, so he met the wife briefly, gave her some money and returned to work. The victim then called the wife, who told him that she was shopping for gifts for her to give to the daughter and for the daughter to give to defendant. The victim came to the mall and ordered the wife not to buy gifts for defendant. When she refused, the victim became "mad" and stopped speaking to her.
The wife completed her shopping and the victim drove her to the restaurant where she was scheduled to work. The wife testified that she and defendant had previously arranged to meet briefly at the restaurant so that she could give him the daughter's new dress. They had also made plans to meet again later that night to celebrate the holiday with the daughter and other family members. When she and the victim arrived at the restaurant, defendant's car was in the parking lot. The victim asked why he was there and became upset when the wife told him about their plans for the evening. She asked the victim to drop her off and leave, but he refused and parked the car. The wife got out, saw defendant as she walked toward the restaurant, spoke with him briefly about the dress exchange and said that she had to go because she was running late for her shift. The victim, whom the wife described as "really mad," then joined them, complaining to the wife that he thought she was late to work. The wife "tried to explain" the plans for the dress exchange to the victim and, because she was late, continued into the restaurant, telling the victim and defendant to "just talk and leave." When she left, the two men were arguing, but were not physically fighting. After she punched in, however, someone told her that defendant and the victim had begun to fight. She went back outside and saw the victim on top of defendant, punching him in the face. She tried and failed to separate them, unsuccessfully sought help inside the restaurant, called 911 and went back outside. When she returned, defendant was gone and the victim was near the restaurant doorway, bleeding. She testified that the victim later told her that he had chased defendant after the fight, saying that he was having difficulty breathing but "still went to [defendant's] car to get him."
Defendant testified on his own behalf, stating that he had learned about the wife's affair with the victim shortly after their separation and had never met the victim, but had seen a picture of him and had once spoken with him briefly on the telephone. He said that he and the wife had remained friendly after the separation, that he wanted to avoid conflict with the victim for the sake of the wife and daughter and that he had no wish to fight with the victim, having heard that he was violent and got into frequent fights. Defendant's testimony was similar to the wife's in describing their interrupted plans to go shopping together and the arrangements to exchange the daughter's dress. He said that he went to the wife's workplace for this purpose at about 5:00 p.m., found that she had not yet arrived, and was walking toward his car to leave when the wife got out of an arriving car. Defendant recognized the car as belonging to the mutual friend, and so thought that the friend was driving. The wife spoke briefly with defendant, told him that she was late and hurried into work. As she did so, the victim suddenly came up and, after saying something to defendant, took a swing at him. They began to struggle, and defendant testified that the victim hit him two or three times on the left side of his head, using what defendant believed were brass knuckles and striking him so hard that defendant "kind of lost [his] vision a little" and thought he might lose consciousness. The victim then pulled out a small blade and said, "[T]his is what I have for you." The victim slashed at defendant a couple of times with the knife while defendant tried to block his arms. They "kind of rolled around [on the ground] a little bit" and the victim got on top of defendant and punched him "quite a few times." Defendant stated that he was "very scared," had never been in such a situation before and believed that he urinated on himself during the altercation, as he later discovered that his clothing was wet. He testified that he "probably" punched at the victim a couple of times, that they got up and fell to the ground more than once as they continued to struggle, and that he was eventually able to grab the victim's arms and get control over them. However, he said that his memory was imperfect and he could not remember exactly what had happened or how the victim had become injured [FN1]. Eventually he was able to break away and run to his car. The victim pursued him, tried to pull the car door open as defendant pulled it shut, and punched at the windows and grabbed at the car as defendant drove away.
Defendant said that he drove first to his apartment, then to the home of a friend and finally to his brother's home, fearing to remain in any of these places because he did not know whether the victim or his friends were looking for him. His brother advised him to go to the home of another relative. As defendant drove away, he saw headlights following him closely, became nervous and missed a turn. When he pulled into a parking lot to turn around, the vehicle followed him and blocked him when he tried to evade it. Defendant said that he could not see very well because it was dark; he heard men yelling and telling him to get out. When he saw police with their guns drawn, he said that he moved slowly in turning off the car and unlocking the doors because he was still nervous. Police took him out through the door and were "a little rough getting [him] out of the car." They told him that he had hurt someone badly, and he responded that he had acted in self-defense.[FN2]
At the police station, defendant gave a video-recorded statement that was admitted into evidence. The statement was similar to his later trial testimony in most respects, but contained greater detail regarding the fight. In the video statement, defendant acknowledged to police that he got possession of the knife from the victim during the fight. He stated that he and the victim [*3]wrestled on the ground until he was finally able to get the victim off him and they got up. Defendant said that he then heard a click, saw the knife in the victim's hand and tried to back up, using his left arm to block while the victim kept trying to swing the knife at him. Defendant said that he did not remember the details of how he grabbed the knife but that the victim continued to come at him after he did so; defendant said that he kept "swinging for his life" as the victim attacked and punched him. The victim then knocked the knife out of defendant's hand. As the victim looked for it, defendant saw an opportunity to escape and ran for his car, with the victim pursuing him. Police photographed defendant's injuries, which included a black eye and bruising on the left side of his face, a number of small abrasions in the same area, bruising on his palm and a small laceration on one finger.
Police officers who were called to the scene testified that they found the victim near the restaurant with slash wounds on his head and a wound on his chest. Nearby, investigators found a folding knife with an orange cord on the handle and blood on the blade that, when tested, matched the victim's DNA profile. DNA from another donor was also present on the blade in a quantity that was insufficient to include or exclude defendant. DNA from a single source matching that of the victim was also present on the handle. The wife identified the knife as belonging to the victim, and stated that the victim regularly carried a knife because he frequently got into fights. The victim, however, denied that the knife belonged to him and testified that it did not resemble the weapon that defendant had used against him, which he described as a mechanical knife with a blade that went straight in and out and did not fold. In defendant's car, investigators found a large fixed knife and a Leatherman tool with a small blade and other implements. The tool did not appear to have blood on it and was not tested, and a substance on the blade of the fixed knife was tested and found not to be blood. The wife testified that the fixed knife looked like defendant's chef's knife, and defendant confirmed that it belonged to him, stating that he used it at work and carried it back and forth from his home because there was nowhere at the restaurant for him to store it.
The police officers' testimony describing their pursuit of defendant was similar to defendant's, except that they said they pulled him out of the car through a window rather than through the door. They also testified that defendant's face struck the pavement and that this caused bruising on defendant's face that was not present before he was removed from the car. They found multiple bloodstains on the interior and exterior of defendant's car, including on the outside of the doors, the driver's window and the rear window on that side. Photographs of the blood stains were taken and admitted into evidence, but no DNA analysis was conducted.
As for the brass knuckles that defendant believed the victim was using, the victim acknowledged that he was wearing multiple large metal rings on both hands during the altercation, and that he frequently wore rings when he went out. The wife testified that the victim often wore these rings and called them his "lucky" rings because he used them to defend himself in fights. The rings were collected from the victim at the hospital and admitted into evidence; an investigator testified that the rings appeared to have blood on them but were not tested for blood or DNA.
Witnesses offered conflicting accounts of the propensities toward violence of defendant and the victim. Defendant testified that he had heard from his wife and a coworker that the victim had a history of violence and of picking fights. The coworker, who was the victim's cousin, had advised him to stay away from the victim and had told him that the victim had once broken a beer bottle over someone's head during a bar fight. The wife testified that she and the victim had recently begun to argue because the victim did not want her to continue her friendly relationship with defendant. She stated that the victim was "[r]eally aggressive" to her when they argued about this, had ordered her not to permit defendant to pick up the daughter at her home and would not let her "go out or [anything] like that." She stated that he became aggressive when he drank, which he did frequently, that he had pushed her once, and that she had seen him get into fights. She testified that she worried that he might do something to defendant, and further testified that the victim was a member of a gang and had made a threat to defendant about this [*4]gang; the wife understood this threat to mean that he wanted to meet defendant with the gang and beat defendant up.
The mutual friend from whom the victim borrowed the car was living with the wife at the time of the incident and had known the victim for about four years. She said that she had never known the victim to carry a knife, including the folding knife that was found at the scene, and that she had never seen him become angry when he was drinking or get into a fight. The friend testified that defendant had once asked her to help him reconcile with the wife and, when she refused, had threatened to beat her up or kill her. She acknowledged on cross-examination that she had not reported this alleged threat to the police. The wife, on the other hand, testified that she had been involved with defendant for 10 years and had never seen him become violent. Defendant also offered the testimony of three supervisors at restaurants where he had worked, all of whom stated that they had never known defendant to be violent or to become angry. They consistently described him as a valued, hard-working employee who did not cause conflicts at work and who had been successfully promoted into positions that required the ability to handle the stressful restaurant environment calmly.
Turning first to defendant's justification defense, a person may use physical force upon another person if he or she was not the original aggressor and "reasonably believes such to be necessary to defend himself [or herself] . . . from what he or she reasonably believes to be the use or imminent use of unlawful physical force by such other person" (Penal Law § 35.15 [1]; see Penal Law § 35.15 [1] [b]). Further, a person may use deadly physical force if he or she reasonably believes that the other person is doing so or is about to do so, but may not use deadly physical force when the person "knows that with complete personal safety . . . to oneself and others he or she may avoid the necessity of so doing by retreating" (Penal Law § 35.15 [2] [a]; see Penal Law § 10.00 [11]; Matter of Y.K., 87 NY2d 430, 434 [1996]; People v Young, 240 AD2d 974, 976 [1997], lv denied 90 NY2d 1015 [1997])[FN3]. Here, as a different verdict would not have been unreasonable, "[we] must, like the trier of fact below, weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony" (People v Bleakley, 69 NY2d 490, 495 [1987] [internal quotation marks and citation omitted]). Upon our independent review, we find that the People did not prove beyond a reasonable doubt that defendant could have retreated with complete personal safety before he used deadly physical force, or that he knew he could do so.
The victim's testimony that defendant began the fight and was the first to use a knife would have supported the conclusion that defendant could have retreated before he did so, had County Court found it to be credible. However, at sentencing, the court expressed a contrary finding, stating that defendant had not brought the knife to the scene of the fight and, instead, that defendant had somehow gotten possession of the knife from the victim during the struggle. Deferring to this credibility assessment, as we must (see e.g. People v Rice, 162 AD3d 1244, 1246 [2018], lv denied 32 NY3d 940 [2018]; People v Perillo, 144 AD3d at 1400), we accept the court's implied finding that the victim was the first to use deadly physical force. Significantly, until the victim did so, defendant had no duty to retreat (see Matter of Y.K., 87 NY2d at 434; People v Curry, 85 AD3d 1209, 1212 [2011], lv denied 17 NY3d 815 [2011]; People v Fermin, 36 AD3d 934, 936 [2007]).
We find nothing in the evidence that proves beyond a reasonable doubt that defendant could have retreated with complete physical safety after the knife was drawn. Although the testimony was sharply conflicting as to many details of the confrontation, both defendant and the victim agreed that the fight went on continuously after the knife emerged. The victim described an unbroken struggle in which he managed to continue to throw punches at defendant even after he was stabbed; although he said that he was trying to defend himself against defendant's [*5]continued attack, he did not testify that there was any break in the action when defendant could have known that he might safely escape. During the brief part of the struggle that the wife described, the victim was on top of defendant, punching him. Defendant told police that he tried to back up after the victim pulled out the knife, but that the victim kept swinging at him. He said that the victim continued to come at him and punch him even after defendant got possession of the knife, forcing him to keep "swing[ing] for his life." According to defendant, the moment when the victim was distracted by the dropped knife was his first opportunity to escape, and the victim pursued him even then. The wife supported this claim with her testimony that the victim told her that he pursued defendant to the car. Critically, although the victim denied that he did so, the forensic evidence of bloody prints on the exterior doors and windows of defendant's car — including some that resemble fingerprints — provides objective support for defendant's assertion that the victim tried to pull the car door open as defendant tried to close it, pounding on the car even as defendant drove away. Upon review, we find this evidence particularly compelling, as it appears to confirm that defendant was indeed fleeing — and still being pursued.
At sentencing, County Court stated that it rejected defendant's justification defense because it found that defense to be inconsistent with the multiple wounds on the victim's face, neck and body. However, "independently assess[ing] all of the proof" and considering the correctness of the court's factual determinations in the role of a second factfinder, as we must, we do not agree that these injuries are inconsistent with defendant's assertion that he had to swing the knife repeatedly to defend himself, as the victim continued to attack and punch him (People v Delamota, 18 NY3d 107, 116-117 [2011]). More significantly, the severity of the victim's injuries does not provide the missing proof that defendant could have retreated with complete safety before he used deadly physical force or even during the knife fight, when he and the victim both testified that the victim continued to throw punches. It was the People's burden to prove "to the same degree as any element of the crime charged" that defendant's actions were not justified (People v McManus, 67 NY2d 541, 546-547 [1986]; see People v Williams, 161 AD3d 1296, 1297 [2018], lv denied 32 NY3d 942 [2018]). Exercising our factual review power and viewing the evidence in a neutral light, we find that the People did not do so and, thus, that defendant's conviction for assault in the first degree must be reversed (see Matter of Y.K., 87 NY2d at 434; People v Morgan, 99 AD3d 622, 622-623 [2012]; see also Matter of Delroy S., 25 NY3d 1064, 1067 [2015]). In view of this conclusion, we also find that the weight of the evidence does not support defendant's conviction for criminal possession of a weapon in the fourth degree (see Penal Law § 265.01 [2]; see also People v Bonilla, 154 AD3d 160, 164-165 [2017], lv denied 30 NY3d 1017 [2017]; People v Sackey-El, 149 AD3d 1104, 1106 [2017]; People v Monger, 71 AD2d 641, 641 [1979]).
Defendant's remaining contentions are rendered academic by this determination.
Clark, Mulvey, Rumsey and Pritzker, JJ., concur.
ORDERED that the judgment is reversed, on the facts, and indictment dismissed.



Footnotes

Footnote 1: Defendant offered the testimony of an expert in the field of psychophysiology, or human stress response, who opined that it was not unusual for a person who is attacked in what he called a "critical incident" to be unable to remember it in detail, and that it is also common for such a person to enter into an altered state of mind after the incident that the expert called tachypsychia, or time-space disorientation, in which the person may be confused, feel fearful and threatened and be unable to calm down for some time afterwards.

Footnote 2: The testimony established that police went to the brother's house because the mutual friend had told them that defendant might be found there, and then followed defendant's car when he left.

Footnote 3: The use of a knife during a fight "constitute[s] deadly physical force as a matter of law" (People v Kerley, 154 AD3d 1074, 1075 [2017], lv denied 30 NY3d 1106 [2018]).